IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| SANDY L. HENDERSON, ANNA MARGARET WICKER, JANE GRAY, and CARMELLE L. HARTIN, | )<br>)<br>)<br>) |
| Plaintiffs, | ) Civil Case No. 74-538-KI |
| vs. | ) OPINION AND ORDER |
| THE STATE OF OREGON BY AND THROUGH THE BUREAU OF LABOR AND THE BOARD OF HIGHER EDUCATION; NORMAN O. NILSEN, COMMISSIONER OF LABOR; DR. ROY LIEUALLEN, CHANCELLOR OF THE PUBLIC EMPLOYEES RETIREMENT SYSTEM; and JOSEPH J. ADAMS, HUGH McKINELY, CHALMERS L. JONES, ROGER S. MEIER and EDWIN H. ARMSTRONG, in their capacity as members of the PUBLIC EMPLOYEES RETIREMENT BOARD, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

Page 1 - OPINION AND ORDER

Henry J. Kaplan
Bennett Hartman Morris & Kaplan, LLP
111 S.W. Fifth Avenue, Suite 1650
Portland, Oregon  97204

      Attorney for Petitioners

Amy Edwards
Stoel Rives, LLP
900 S.W. Fifth Avenue, Suite 2600
Portland, Oregon  97204

      Attorney for Defendant State of Oregon

Joseph M. Malkin
Orrick, Herrington & Sutcliffe LLP
405 Howard Street
San Francisco, California  94105

      Attorney for Defendant Public Employees Retirement System

William F. Gary
Harrang Long Gary Rudnick, P.C.
360 E. 10th Avenue, Suite 300
Eugene, Oregon  97401-3273

      Attorney for Intervenor Salem-Keizer School District


KING, Judge:

Female employees of the State of Oregon who paid into the Public Employee Retirement System ("PERS") filed this case in 1974, alleging claims for sex discrimination under Title VII. Monthly retirement benefits were higher for a male with the same account balance as a female because different life expectancy tables were used for men and women. Judge Solomon ruled in favor of plaintiffs. While the case was on appeal, the United States Supreme Court issued <u>City of Los Angeles v. Manhart</u>, 435 U.S. 702, 98 S. Ct. 1370 (1978), which held that Title VII

Page 2 - OPINION AND ORDER

prohibited discrimination between males and females in their pension contributions. As a result of <u>Manhart</u>, plaintiffs and the PERS board ("PERB") settled and the court entered a Consent Decree.

The case was reopened in October 2003. Petitioners sought a finding that PERB was in civil contempt for violating the Consent Decree as a result of PERS reforms implemented that year. Judge Mosman did not hold PERB in contempt after determining that the Consent Decree language was not sufficiently clear for PERB to determine if the reforms violated it. Petitioners then sought a declaration that the Consent Decree required PERB to use refund annuity tables which grant benefits no less than the benefits in effect for males on July 1, 1978. The court dismissed as moot the motion for a declaratory judgment.

Petitioners appealed. In rulings relevant to the motions now before me, the Ninth Circuit affirmed the denial of the motion for contempt and held that the claim seeking a declaratory judgment was not moot and was not precluded by either claim or issue preclusion. On remand, the case was assigned to me. Now before the court are cross-motions for summary judgment concerning the declaratory relief. For the reasons below, I conclude that petitioners' interpretation of the Consent Decree is incorrect, specifically, that the benefits in effect for males on July 1, 1978 do not form a floor for future benefits.

## OBJECTIONS TO DECLARATIONS

PERB objects to affidavits of William Hoelscher, James McGoffin, and Gerard Liebertz which were filed by petitioners. PERB contends that the affidavits are not relevant, contain hearsay, are not based on personal knowledge, lack foundation, and contain privileged information and improper legal conclusions. The relevancy argument is based on PERB's

contention that the Consent Decree is not ambiguous so extrinsic evidence should not be considered when interpreting it. As explained below, I consider the language ambiguous so I am not persuaded by PERB's relevancy argument.

I agree that many paragraphs state legal conclusions or summarize legal documents which I can read and analyze myself. Accordingly, I strike paragraphs 2 through 4 of the Hoelscher Affidavit and paragraphs 2 and 3 of the Liebertz and McGoffin Affidavits.

PERB contends that paragraph 5 of the Hoelscher Affidavit lacks foundation because it is conclusory and provides facts beyond those stated in the PERB minutes of the meeting. Hoelscher states that he was at the meeting. Thus he has personal knowledge of what happened there. I am not surprised that the meeting minutes are more concise. PERB also contends that Hoelscher, PERB's attorney at the time, must be disclosing privileged information because it is not reflected in the minutes. The meetings were public. I see no facts on which to base a conclusion that Hoelscher's explanation of what happened is covered by either the attorney client privilege or by the deliberative process privilege. PERB only presents arguments and not evidence that the discussion was held privately rather than as part of the public meeting.

PERB argues that Hoelscher has no basis for stating what the Court understood concerning implementation of the Consent Decree. I agree and will rely on the language in the document itself.

Concerning the Liebertz and McGoffin Affidavits, PERB objects that the men do not state their basis for personal knowledge of PERB's actions concerning the Consent Decree. Although both men were PERS administrators when PERB made the decision, they do not state that they were at the meeting when PERB decided to attempt to negotiate a settlement with the

Page 4 - OPINION AND ORDER

Henderson plaintiffs. As far as I know, they were not board members. I strike paragraphs 4, 6, and 8 from both affidavits for lack of personal knowledge to support the statements.

**FACTS**

Retired PERS members receive a monthly service retirement allowance which is the highest of one of three calculations: full formula, pension plus annuity, and money match. Part of the service retirement allowance consists of a refund annuity, the calculation of which is in dispute here. The amount of the refund annuity depends on life expectancy tables, an assumed interest rate, and the retiree's account balance. The life expectancies and assumed interest rate are actuarial equivalency factors used to convert the retiree's account balance at the time of retirement into a monthly service retirement allowance. PERS uses refund annuity tables based on the actuarial equivalency factors that show the monthly payment (per $1,000 of the retiree's account balance) as a function of the retiree's age at retirement.

Prior to 1978, PERB used different refund annuity tables for men and women based on the different life expectancies for the sexes.

In 1974, four female state employees ("Henderson plaintiffs") filed this case challenging PERB's use of two sets of life expectancy tables, one for men and another for women. They sought a "judgment declaring that defendants' practice of paying higher monthly retirement benefits to male employees than to female employees is an unlawful employment practice under Title VII of the Civil Rights Act of 1964." Am. Compl., Hartman Decl. Ex. 2 at 4. The Henderson plaintiffs were not yet retired when they filed the case.

In their Trial Memorandum, defendants stated that existing pension benefits were vested and could not be reduced under trust law. On January 16, 1976, Judge Solomon entered a

Judgment stating, "Title VII of the Civil Rights Act of 1964 prohibits the use of sex segregated life expectancy tables in calculating refund annuity benefits for State employees." Hartman Decl. Ex. 8 at 2. He stayed injunctive relief pending appeal. In the Opinion, Judge Solomon stated that benefits vest only after employees retire so that a man currently contributing to the fund is entitled to some benefits but not to a specified amount.

While this case was on appeal, the United States Supreme Court issued <u>Manhart</u> on April 25, 1978. On May 25, 1978, Hoelscher briefed PERB on <u>Manhart</u> during an open meeting. <u>Manhart</u> considered a benefit format that differed from the PERS plans challenged in <u>Henderson</u>. The minutes state Hoelscher told PERB that it had to decide whether to contest <u>Manhart</u>'s application to Oregon's benefit format in the Ninth Circuit, or to negotiate a consent judgment based on the seeming intent of <u>Manhart</u>, or to have the Ninth Circuit "hear the existing pleading in its normal course, risking the issue of retroactivity." Hartman Decl. Ex. 10 at 6. PERB discussed using a unisex table that blended the male and female rates, which would reduce the males' refund annuities. When Hoelscher questioned the legality of a reduction, PERB "directed Mr. Hoelscher to attempt a negotiated consent judgment with the plaintiffs, agreeing to increase the female annuity factor to that of the male rate effective July 1, 1978 and thereafter." <u>Id.</u> There was a discussion of the effect of <u>Manhart</u> on survivor benefits. A motion was made "that effective July 1, 1978, the refund annuity benefit for females be equal to that received by the males; recognizing that the employer rate will ultimately have to be increased, but taking no action at this time to put that increase into effect." <u>Id.</u> at 7. The motion passed unanimously.

According to Hoelscher, PERB directed him to negotiate a consent judgment settlement, if possible, which would increase the female annuity factor to that of the male rate effective

Page 6 - OPINION AND ORDER

July 1, 1978 and thereafter, without retroactivity. This would "top up" the female actuarial tables to equal the male actuarial tables rather than adopt blended male and female rates. Hoelscher negotiated a Consent Decree, entered on September 20, 1978 which states, in relevant part:

> 2. Title VII of the Civil Rights Act of 1964 prohibits the use of sex-segregated life expectancy tables in calculating "refund annuity" retirement allowances of employe members of the Oregon Public Employe Retirement System.
>
> 3. Defendant Public Employes Retirement System is permanently enjoined and restrained from the use of sex-segregated life expectancy tables in calculating "refund annuity" retirement allowances prospectively only for members retiring effective July 1, 1978, and thereafter, shall provide a monthly "refund annuity" retirement allowance to female members retiring after that date which is identical to the "refund annuity" retirement allowance males of the same age and amount of contributions received prior to that date. Defendant shall have no obligation to recalculate "refund annuity" retirement allowances to female members already retired or retiring before July 1, 1978.

Hartman Decl. Ex. 11 at 2. The Consent Decree was discussed with Judge Solomon at a conference but no transcript is available.

Between July 1, 1978 and January 1, 1989, PERB applied the male-only annuity tables in effect before July 1, 1978 without change for all PERS members, both male and female. PERB modified its earnings assumptions in 1979 and 1989. In 1979, the earnings assumption was raised from 7% to 7.5%. In 1979, the PERS actuary compared male-only mortality at 7% with blended mortality at 7.5% and recommended no changes to the annuity tables. In 1989, the earnings assumption was raised to 8% and the mortality tables were changed to blend males and females and all job classes into one group.

In 1991, PERB authorized a complete review of actuarial factors. It issued a report in 1992 which stated: "The grandfathered . . . factors from 1978 were still more favorable at most

ages than the factors based on current assumptions." Hartman Decl. Ex. 16 at 4. PERB adopted the 1992 or 1978 actuarial equivalency factors which provided the higher benefit for each age group.

In 1993, PERB amended its refund annuity tables to accept the new actuarial equivalency factors where the newer blended tables and 8% earnings assumption produced the higher benefit. In 1993, PERB revised OAR 459-05-055 so that PERB would not change the current factor if the actuary's recommendation to change a factor would produce a lower benefit.

In 1996, PERB again changed OAR 459-05-055 to allow a fresh start of actuarial equivalency factors for members joining PERS on or after January 1, 1999. Changes to actuarial equivalency factors would be prospective only.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. Universal Health Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

## DISCUSSION

Petitioners reopened this case because the PERS reforms resulted in a PERS member retiring after 2003 receiving a smaller monthly refund annuity payment than a male retiring on

Page 8 - OPINION AND ORDER

July 1, 1978, even though both retired at the same age with the same account balance. Petitioners contend that the Consent Decree expressly requires the use of the July 1, 1978 male refund annuity retirement allowances as a floor for all retiring PERS members for as long as the decree remains in effect. Petitioners seek a declaration that the refund annuity rates implemented by the 2001 tables fall below the rates mandated by the Consent Decree.

A consent decree is construed under the ordinary contract principles of the state in which the decree is signed. Gates v. Gomez, 60 F.3d 525, 530 (9th Cir. 1995). Generally, a consent decree is construed within its four corners. Extrinsic evidence is only relevant to resolve ambiguous language in the decree. United States v. Asarco Inc., 430 F.3d 972, 980 (9th Cir. 2005), cert. denied, 127 U.S. 435 (2006).

"To interpret a contractual provision, . . . , the court follows three steps. First, the court examines the text of the disputed provision, in the context of the document as a whole." Yogman v. Parrott, 325 Or. 358, 361, 937 P.2d 1019 (1997). "If the provision is clear, the analysis ends." Id.

> When considering a written contractual provision, the court's first inquiry is what the words of the contract say . . . . To determine that, the court looks at the four corners of a written contract, and considers the contract as a whole with emphasis on the provision or provisions in question. The meaning of disputed text in that context is then determined. In making that determination, the court inquires whether the provision at issue is ambiguous. Whether terms of a contract are ambiguous is a question of law. In the absence of an ambiguity, the court construes the words of a contract as a matter of law

Id. (quoting Eagle Industries, Inc. v. Thompson, 321 Or. 398, 405, 900 P.2d 475 (1995)).

A contract or term is unambiguous if it has only one sensible and reasonable interpretation. D&D Co. v. Kaufman, 139 Or. App. 459, 462, 912 P.2d 411 (1996). For a

contract or term to be legally ambiguous, it must be susceptible to at least two plausible interpretations when examined in the context of the contract as a whole. Moon v. Moon, 140 Or. App. 402, 407, 914 P.2d 1133 (1996).

If the contractual provision at issue is still ambiguous after examining the text and its context, the second step "is to examine extrinsic evidence of the contracting parties' intent." Yogman, 325 Or. at 363. In determining whether an ambiguity exists, the court may consider parol and other extrinsic evidence. Moon, 140 Or. App. at 407; see also Adams v. Knoth, 102 Or. App. 238, 243-44, 794 P.2d 796 (1990) ("[i]n deciding if the language of a contract is ambiguous, it is proper for the court to consider extrinsic evidence regarding the circumstances under which an agreement was made or to which it relates."). The parties' "practical construction of an agreement may hint at their intention." Yogman, 325 Or. at 364.

When the Consent Decree is examined in context, it is susceptible to two plausible interpretations, namely, those put forward by the parties before me. Thus, the Consent Decree is ambiguous and I will examine extrinsic evidence to determine the parties' intent.

Petitioners contend that the plain language of the Consent Decree sets the male retirement allowance as a floor. According to petitioners, if the only purpose of the Consent Decree was to prohibit the use of sex-segregated life expectancy tables, the following phrase is superfluous: "and thereafter, shall provide a monthly 'refund annuity' retirement allowance to female members retiring after that date which is identical to the 'refund annuity' retirement allowance males of the same age and amount of contributions received prior to that date." Petitioners do not argue that the topping-up methodology was meant to be permanent and note the change to blended refund annuity tables in 1991. At that time, the interest assumptions increased enough to

counterbalance the loss due to changes in mortality assumptions so that the July 1, 1978 male rates still acted as a floor.

Defendants[1] contend that the "thereafter" clause indicates PERB's intent to top up female allowances on July 1, 1978 to the male allowance levels "prior to that date." Defendants argue that the phrases reflect the timing and methodology for equalizing benefits and do not institute a floor of benefits at the 1978 levels. According to defendants, the context and circumstances surrounding the entry of the Consent Decree show that it was meant to address gender inequality and not to lock in a refund annuity level regardless of changes in actuarial equivalency factors.

The most important factor in this analysis is the language of the Consent Decree, viewed in the context of the decree's entry to settle a Title VII case. The <u>Henderson</u> plaintiffs sought benefits equivalent to similarly-situated males. The second paragraph of the Consent Decree gave them this result. The third paragraph explains how the result will be implemented. Making changes to a large retirement system is a massive undertaking, as explained in <u>Manhart</u>. A starting date had to be chosen. The date could have been more retroactive than the two months implemented (July 1 to September 20 filing date of the decree) or a date a year in the future could have been chosen. This was negotiated by the parties and included in the third paragraph. Defendants' interpretation does not result in superfluous language.

Defendants note that the Consent Decree uses the word "identical" and does not contain any language requiring the benefits for males to be a floor amount. They claim that "identical" reflects PERB's commitment to maintain parity in benefits, namely, that male and female

---

[1] I will not differentiate between the arguments of defendants and intervenors and refer to all as defendants.

Page 11 - OPINION AND ORDER

benefits would remain identical thereafter.  Thus, defendants contend there is no support for petitioners' contention that PERB should ignore actuarial equivalency factors if they cause the refund annuity to dip below the claimed floor of benefits, but on the other hand, award an upward adjustment if the actuarial equivalency factors lead to an increase in benefits.

Petitioners claim that "identical" means that similar accounts–with the same account balance, years of service, age at retirement, and retirement option–will be treated the same.

Petitioners' argument is unpersuasive based on the location of the word "identical" in the sentence: "shall provide a[n] . . . allowance to female members retiring after that date which is identical to the . . . allowance males of the same age and amount of contributions received prior to that date."  "Identical" clearly modifies "allowance" and not "accounts."  This is strong support for defendants' contention that the use of "identical" was to ensure that benefits paid to similarly-situated men and women would be the same and not differ based on sex.  Moreover, since the Consent Decree was entered, PERB kept the benefits identical between similarly-situated men and women but clearly did not keep the benefits identical to what was paid to men in 1978.  The benefits stayed level or rose over the years when compared to the male 1978 benefit level.

Petitioners contend that the final sentence of paragraph 3, concerning retroactivity, reflects the consideration given by the <u>Henderson</u> plaintiffs in exchange for getting a floor on refund annuity benefits.  Petitioners characterize this as a substantial concession because PERB faced serious liability exposure to retroactive payments after <u>Manhart</u>.

Defendants note that none of the <u>Henderson</u> plaintiffs were entitled to retroactive relief because none had retired at the time of the entry of the Consent Decree.  They contend that the

Henderson plaintiffs could not waive the right to retroactive relief for any female retirees who were not parties to the suit, which was not a class action.

In reply, Petitioners argue that all third-party beneficiaries of the January 16, 1976 injunction could sue for retroactive relief, at least back to the date of that injunction. They claim that the Consent Decree cut off third-party beneficiary rights under the 1976 injunction even if it did not cut off rights of third parties to file their own Title VII cases. Further, petitioners contend that no matter what is legally correct in hindsight, PERB feared retroactive claims in 1978.

Petitioners also note the extrinsic evidence of the meaning of the Consent Decree. Petitioners argue the evidence shows that PERB believed Manhart exposed it to a significant risk of retroactive liability but there was a serious question on the legality of reducing benefits for male members. Thus, the settlement released retroactive liability in exchange for topping-up the tables for female members.

The Supreme Court has discussed retroactive remedies in a series of Title VII cases, some of which were early enough to inform PERB's concern about retroactive claims. Although defendants in Albemarle Paper Co. v. Moody, 422 U.S. 405, 409, 95 S. Ct. 2362 (1975), were found to have committed race discrimination by locking black employees into lower paying job classifications, the trial court did not award back pay. The Court remanded for review under the correct standard, noting, "given a finding of unlawful discrimination, back pay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." Id. at 421. Moreover, the absence of bad faith was not a sufficient reason to deny back pay. Id. at 422.

Page 13 - OPINION AND ORDER

In Manhart, the Court held that it was inappropriate for the trial court to award retroactive relief to the retirees. Manhart, 435 U.S. at 719-23. The Court noted that pension administrators "could reasonably have thought it unfair – or even illegal – to make male employees shoulder more than their actuarial share of the pension burden." Id. at 720 (internal quotation omitted).

> The occurrence of major unforeseen contingencies, however, jeopardizes the insurer's solvency and, ultimately, the insureds' benefits. Drastic changes in the legal rules governing pension and insurance funds, like other unforeseen events, can have this effect. Consequently, the rules that apply to these funds should not be applied retroactively unless the legislature has plainly commanded that result.
>
> . . . .
>
> . . . Although Title VII was enacted in 1964, this is apparently the first litigation challenging contribution differences based on valid actuarial tables. Retroactive liability could be devastating for a pension fund. The harm would fall in large part on innocent third parties.

Id. at 721-23.

After the Consent Decree was entered, Arizona Governing Comm. for Tax Deferred Annuity and Deferred Compensation Plans v. Norris, 463 U.S. 1073, 103 S. Ct. 3492 (1983), found a Title VII violation for unequal benefits in the state pension plan and remanded for the trial court to consider the issues of pre-Manhart versus post-Manhart contributions and contractual rights. Id. at 1092-95. The Court further clarified the issue in Florida v. Long, 487 U.S. 223, 108 S. Ct. 2354 (1988), when it held that employer pension plans providing discriminatory *payment options* become liable as of the time of decision in Norris, rather than Manhart, which analyzed discriminatory *contribution requirements*. Id. at 230-38. The parties negotiating the Consent Decree did not have the benefit of these last two cases.

Based on PERB's minutes, it clearly had a concern about retroactive relief, even in the face of Manhart's refusal to award any such relief due to concerns about pension fund solvency if hit with this unexpected expense. PERB was also concerned about reducing male benefits, again in spite of Judge Solomon's ruling to the contrary. I am not persuaded that much was given up in the nature of possible retroactive liability. Clearly, the Henderson plaintiffs could not release the claims of anyone else and they were not personally entitled to retroactive payments. If third-party beneficiaries of the January 16, 1976 injunction sued for retroactive relief, however, there was little to gain by basing the suit on that injunction. The third-party beneficiary could likely have won a quick victory based on Manhart. Because little was given up in reducing retroactive liability, little would have been received in exchange. Even if the settlement released retroactive liability in exchange for topping up the tables for female members, that does not mean that the newly topped-up benefit amount was to act as the floor in perpetuity.

Petitioners note that PERB has consistently treated the July 1, 1978 refund annuity tables as a floor in implementing the Consent Decree since 1978. Defendants contend that PERB was motivated only to protect what it perceived to be vested benefits and its Internal Revenue Code status and not to maintain the 1978 refund annuity tables as a floor.

PERB's conduct through the years is petitioners' best argument. PERB did consistently use the 1978 male benefits as a floor. PERB was motivated, however, not to reduce benefits because it believed that the level was vested and could not be reduced legally. This is clear from the minutes of the board meeting in which PERB decided to seek a settlement. There is no discussion in the minutes that the benefits would be a floor as a result of the Consent Decree rather than as a result of a fear of ever reducing benefit levels that were thought to be vested at a

Page 15 - OPINION AND ORDER

particular amount. Even after benefits were raised above the male 1978 level, there is no evidence the benefits were ever reduced at all, other than prospectively only, until the reforms that reopened this case. This policy was formalized in the 1993 revision to OAR 459-05-055. PERB's conduct, when viewed in this way, supports the argument that PERB's concern was reducing benefits it considered vested, and not the Consent Decree.

After considering the language of the Consent Decree, the arguments concerning retroactivity, the extrinsic evidence primarily in the form of PERB minutes, and most important to the analysis, the context of the Consent Decree being entered to settle a Title VII claim, I find that petitioner's interpretation is incorrect. I conclude that the Consent Decree does not require PERB to use refund annuity tables which grant benefits no less than the benefits in effect for males on July 1, 1978.

## CONCLUSION

Petitioner's Motion for Summary Judgment (#154) is denied. Defendant PERB's Cross-Motion for Summary Judgment (#150), Intervenor Salem-Keizer School District's Cross-Motion for Summary Judgment (#156), and State of Oregon's Cross-Motion for Summary Judgment (#161) are granted. The declaratory judgment sought by petitioners will not be entered.

IT IS SO ORDERED.

Dated this ___18th___ day of April, 2007.

                                              ___/s/ Garr M. King___
                                              Garr M. King
                                              United States District Judge